******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

# IN RE JACOB W. ET AL.*
## (AC 40202)

DiPentima, C. J., and Prescott and Mihalakos, Js.

*Syllabus*

The maternal grandmother of the three minor children, who had petitioned the Probate Court for and had been granted custody of the children following the arrest of the respondent father and the children's mother on charges involving the sexual assault of other minors, filed petitions in the Probate Court for the termination of the parental rights of both parents. The grandmother alleged the statutory grounds of abandonment and the nonexistence of an ongoing parent-child relationship, as the father has had no contact with the children since his conviction of the charges and incarceration in 2016, and the mother subsequently consented to the termination of her parental rights. Thereafter, the matter was transferred from the Probate Court to the Superior Court, where the trial court rendered judgments denying the petitions to terminate the father's parental rights, from which the grandmother appealed to this court. The trial court concluded that the grandmother had failed to prove either abandonment or the lack of an ongoing parent-child relationship by clear and convincing evidence, and based its conclusion on its findings that the father provided for the children financially and was actively involved in their lives prior to his incarceration, that he was prohibited from making contact with the home of the grandmother, the legal guardian of the children, due to a protective order related to the sexual assault charges, that he had contacted the Department of Children and Families to request assistance with having contact with the children during his incarceration, and that he signed up to have Christmas gifts sent to the children through a program offered to incarcerated parents and had requested updates regarding the children through the Probate Court. *Held*:

1. The trial court applied an incorrect legal test for determining whether there was an ongoing parent-child relationship pursuant to the applicable statute (§ 45a-717 [g] [2] [C]), which requires the court to first determine that no parent-child relationship exists and, second, to determine whether it would be detrimental to the child's best interests to allow time for such a relationship to develop: in determining whether an ongoing parent-child relationship existed, that court's inquiry should have focused foremost on whether the children presently had positive feelings toward the respondent father, but, instead, the court focused on the actions that the father undertook to maintain a relationship with the children and did so pursuant to the exception that applies where a custodian has unreasonably interfered with a noncustodial parent's visitation or other efforts to maintain an ongoing parent-child relationship such that the custodian's unreasonable interference leads inevitably to the lack of an ongoing parent-child relationship, which would preclude the termination of the noncustodial parent's parental rights on the ground of no ongoing parent-child relationship; moreover, because a child's present positive feelings would be enough to establish the existence of an ongoing parent-child relationship, and it is only if the child possesses no present positive feelings for the parent, or if an infant child's present feelings cannot be ascertained, that a court may consider the question of whether a custodian has unreasonably interfered with the parent's effort's to maintain or establish a parent-child relationship, the trial court here could not logically have concluded both that an ongoing parent-child relationship existed and that unreasonable interference inevitably prevented the father from maintaining an ongoing parent-child relationship; accordingly, the court's adjudicatory analysis was erroneous, and a new trial was warranted.

2. Even if the trial court's application of the test for determining whether there was an ongoing parent-child relationship was legally and logically correct, its decision could not stand because the court's findings were fatally inconsistent; although that court found in the adjudicatory phase that the custodial grandparents had interfered with the parent-child

relationship by failing to facilitate contact between the respondent father and the children, and by influencing and manipulating the feelings of the children with false and misleading information about the father, it subsequently found in the dispositional phase that there was no evidence presented demonstrating that the father was prevented from maintaining a meaningful relationship by the unreasonable acts of another person or by the economic circumstances of the parent, and, therefore, this court could not reconcile the trial court's findings by clear and convincing evidence both that there was interference and that there was no evidence of interference.

Argued September 7—officially released November 16, 2017**

*Procedural History*

Petitions to terminate the respondent father's parental rights with respect to his minor children, brought to the Probate Court for the district of Ellington and transferred to the Superior Court in the judicial district of Tolland, Juvenile Matters at Rockville; thereafter, the court granted the petitioner's request for leave to amend the petitions; subsequently, the matter was tried to the court, *Westbrook, J.*; judgments denying the petitions, from which the petitioner appealed to this court. *Reversed; new trial.*

*James P. Sexton*, assigned counsel, with whom was *Marina L. Green*, assigned counsel, for the appellant (petitioner).

*Benjamin M. Wattenmaker*, assigned counsel, with whom was *Amir Shaikh*, assigned counsel, for the appellee (respondent father).

*Cara S. Richert*, for the minor children.

*Opinion*

DiPENTIMA, C. J.The petitioner, the maternal grandmother of the minor children,[1] appeals from the judgments of the trial court denying her petitions to terminate the parental rights of the respondent father as to his children, J, N and C.[2] On appeal, the petitioner challenges the trial court's conclusion that she had failed to prove the nonexistence of an ongoing parent-child relationship by clear and convincing evidence as required by General Statutes § 45a-717 (g) (2) (C).[3] The petitioner argues, inter alia, that the trial court applied the incorrect legal test to determine whether such a relationship exists by focusing on the respondent's actions rather than the children's feelings.[4] We agree that the trial court applied the incorrect test because the court legally and logically cannot have found both that a parent-child relationship exists and that the custodians prevented such a relationship from existing. Moreover, even under the test as applied, the trial court's conclusions are inconsistent. Accordingly, we reverse the judgments of the trial court and remand the case for a new trial.

The following facts and procedural history are relevant to our consideration of this appeal. The respondent and the mother married in 2008. They had three children together: J was born in the fall of 2006, N in the summer of 2008 and C in the summer of 2012. The respondent, the mother and the children lived together first in an apartment and then in the maternal grandparents' (grandparents) home.

In April, 2014, the respondent was arrested on several counts of sexual assault of minors. In July, 2014, the mother was arrested for conspiring with the respondent to commit the same. Although the children were not among the victims of these crimes, the mother's minor sister (aunt),[5] who also resided with the grandparents at the time, was.

Following the parents' arrests, the grandparents successfully petitioned the Ellington Probate Court for custody. Because the aunt still resided with the grandparents, a protective order was entered prohibiting the respondent from contacting the aunt's immediate family, including her parents and siblings.

After a criminal trial, the respondent was convicted on all counts and was sentenced in January, 2016, to twenty-nine years incarceration. The mother pleaded guilty and was sentenced in March, 2015, to five years incarceration.[6] At first, the children did not know that the respondent had been incarcerated. The grandparents later told the children that the respondent was in prison for hitting their mother. The respondent has had no contact with the children since his incarceration.

The petitioner first filed her petitions for termination of both parents' parental rights in the Ellington Probate

Court in November, 2015. After initially alleging the statutory ground of denial of care by parental acts of commission or omission,[7] the petitioner, with leave of the court, amended her petitions in November, 2016, to allege the statutory grounds of abandonment and the nonexistence of an ongoing parent-child relationship. The attorney for the minor children moved to transfer the matter from the Probate Court to the Superior Court, which motion was granted in May, 2016. Shortly before the trial, the court appointed a guardian ad litem to represent the best interests of the children. As part of the proceedings, the Department of Children and Families (department) was ordered to complete a social study in April, 2016, pursuant to § 45a-717 (e).[8] The study ultimately recommended termination of the parental rights of the respondent, but not the mother. The mother nevertheless consented to the termination of her parental rights four months later.

After a two-day trial in January, 2017, the court denied the petition to terminate the respondent's parental rights, concluding that the petitioner had failed to prove either abandonment or the lack of an ongoing parent-child relationship by clear and convincing evidence. In its memorandum of decision, the court made the following adjudicatory findings and legal conclusions with respect to the existence or lack of an ongoing parent-child relationship.

"Here, the court finds that the petitioner has not demonstrated that there is a lack of a parent-child relationship nor that it would be detrimental to allow further time for the establishment of the relationship. Again, prior to his incarceration, [the] respondent father worked and provided for the children financially. [The] respondent father threw birthday parties and actively participated in the children's daily activities. [The] respondent father facilitated a relationship between the minor children and their maternal relatives. [The] respondent father is prohibited from making contact with the home of the maternal grandparents/legal guardian due to a protective order. During the pendency of his incarceration, [the] respondent father contacted the [department] to request assistance in having contact with his children. [The] respondent father also signed up to have Christmas gifts sent to the children through a program that purchases gifts for the children of incarcerated parents. On December 9, 2014, [the] respondent father, through the Probate Court, requested updates regarding his children. The legal guardians agreed but did not provide updates. The Connecticut Appellate Court in *In re Carla C.*, [167 Conn. App. 248, 143 A.3d 677 (2016)] found that 'when a custodial parent has interfered with an incarcerated parent's visitation and other efforts to maintain an ongoing parent-child relationship with the parties' child, the custodial parent cannot terminate the noncustodial parent's parental rights on the ground of no ongoing parent-child relation-

ship.' [Id., 251]. Further, our Supreme Court, with the legislature's acquiescence, effectively has relaxed the requirement that a noncustodial parent's provision for a child's needs be on a 'continuing, day-to-day basis' where visitation rights are limited: 'Our 1979 decision in *In re Juvenile Appeal (Anonymous)*, 177 Conn. [648, 675, 420 A.2d 875 (1979)], expressly rejected the trial court's determination that no ongoing parent-child relationship meant no *meaningful* relationship.' [Emphasis in original.] *In re Carla C.*, [supra, 267 n.19].

"[The] respondent father is prohibited from having contact with the minor children because of the protective order disallowing contact with the home of the [petitioner]. Despite the order, [the] father has reached out to [the department], and the Probate Court to facilitate contact. No party has facilitated contact with the children and father. The [petitioner] agreed to facilitate contact in 2014 but has not done so. The [petitioner] is custodial and has now filed a petition to terminate [the] respondent father's parental rights alleging lack of parental contact. The children have developed a substantial bond with the legal guardians who wish to adopt the children. The court in *In re Jessica M.*, 217 Conn. [459, 475, 586 A.2d 597 (1991)], noted that although the ability and willingness of the guardians to adopt the child might be relevant to a best interest determination, it is irrelevant in determining whether an ongoing parent-child relationship existed.

"There was no evidence presented by the petitioner at trial that would support a claim that additional time to reestablish a relationship with the children would be detrimental. The statements of dislike by very young children with false information about their father does not establish by clear and convincing evidence that reestablishing a relationship would be detrimental."

In regard to the § 45a-717 (i) criteria, the court did not find "by clear and convincing evidence that the necessary statutory ground alleged by the petitioner for the termination of the parent's parental rights have been proven. However, before making a decision on whether or not to terminate the respondents' parental rights, the court must consider and make findings on each of the six criteria set out in . . . § 45a-717 ([i])." The court found the criteria to have been established by clear and convincing evidence.

Specifically, with regard to the sixth criteria concerning " '[t]he extent to which a parent has been prevented from maintaining a meaningful relationship by the unreasonable act of any other person or by the economic circumstances of the parent,' " the court found that "[t]here was no evidence presented demonstrating that [the] father was prevented from maintaining a meaningful relationship by the unreasonable acts of another person or by the economic circumstances of the parent." This appeal followed. Additional facts will

be set forth as necessary.

We begin with the applicable legal principles. Termination of parental rights upon a petition by a private party is defined as "the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and the child's parent . . . ." General Statutes § 45a-707 (8). "It is, accordingly, a most serious and sensitive judicial action." (Internal quotation marks omitted.) *In re Jessica M.*, supra, 217 Conn. 464. See also *In re Juvenile Appeal (Anonymous)*, supra, 177 Conn. 671.

General Statutes § 45a-715 (a) (2) permits a child's guardian, among others, to petition the Probate Court to terminate the parental rights of that child's parent(s).[9] "In order to terminate a parent's parental rights under § 45a-717, the petitioner is required to prove, by clear and convincing evidence, that any one of the seven grounds for termination delineated in § 45a-717 (g) (2) exists and that termination is in the best interest of the child. General Statutes § 45a-717 (g) (1)." *In re Brian T.*, 134 Conn. App. 1, 10, 38 A.3d 114 (2012). Those seven grounds are: abandonment, acts of parental commission or omission, no ongoing parent-child relationship, neglect/abuse, failure to rehabilitate, causing the death of another child or committing a sexual assault that results in the conception of the child. General Statutes § 45a-717 (g) (2).

"A hearing on a petition to terminate parental rights consists of two phases: the adjudicatory phase and the dispositional phase. During the adjudicatory phase, the trial court must determine whether one or more grounds for termination of parental rights set forth in . . . [§] 45a-717 (g) (2) has been proven by clear and convincing evidence. . . .

"In the dispositional phase . . . the emphasis appropriately shifts from the conduct of the parent to the best interest of the child. . . . The best interests of the child include the child's interests in sustained growth, development, well-being, and continuity and stability of [her] environment. . . . [T]he trial court must determine whether it is established by clear and convincing evidence that the continuation of the respondent's parental rights is not in the best interest of the child. . . .

"Clear and convincing proof is a demanding standard denot[ing] a degree of belief that lies between the belief that is required to find the truth or existence of the [fact in issue] in an ordinary civil action and the belief that is required to find guilt in a criminal prosecution. . . . [The burden] is sustained if evidence induces in the mind of the trier a reasonable belief that the facts asserted are highly probably true, that the probability that they are true or exist is substantially greater than the probability that they are false or do not exist. . . .

"Our standard of review on appeal from a termination of parental rights is whether the challenged findings are clearly erroneous.[10] . . . The determinations reached by the trial court that the evidence is clear and convincing will be disturbed only if [the challenged] finding is not supported by the evidence and [is], in light of the evidence in the whole record, clearly erroneous. . . .

"On appeal, our function is to determine whether the trial court's conclusion was legally correct and factually supported. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached . . . nor do we retry the case or pass upon the credibility of the witnesses. . . . Rather, on review by this court every reasonable presumption is made in favor of the trial court's ruling." (Citations omitted; footnotes altered; internal quotation marks omitted.) *In re Carla C.*, supra, 167 Conn. App. 257–59; see also *In re Payton V.*, 158 Conn. App. 154, 160–61, 118 A.3d 166, cert. denied, 317 Conn. 924, 118 A.3d 549 (2015); *In re Justice V.*, 111 Conn. App. 500, 512–13, 959 A.2d 1063 (2008), cert. denied, 290 Conn. 911, 964 A.2d 545 (2009).

The primary issue on appeal is whether the trial court erred when it found that the petitioner had not proved the lack of an ongoing parent-child relationship by clear and convincing evidence. The arguments in support of this single claim, however, are manifold. The petitioner contends that the trial court applied an incorrect legal test for determining whether there is an ongoing parent-child relationship, made findings of fact that are clearly erroneous under these circumstances and upon this record, erroneously concluded that allowing a parent-child relationship to form would not be detrimental to the children's best interests and erroneously concluded that termination of parental rights was not in the children's best interest.[11] Because we agree that the court erred in its construction and application of the legal test, we do not consider the other arguments.

I

The trial court applied an incorrect legal test. To find that an ongoing parent-child relationship does not exist pursuant to § 45a-717 (g) (2) (C), the trial court must conduct a two part analysis. "First, there must be a determination that no parent-child relationship exists, and, second, the court must look into the future and determine whether it would be detrimental to the child's best interests to allow time for such a relationship to develop. . . . The best interest standard . . . does not become relevant until after it has been determined that no parent-child relationship exists. . . .

"The definition of no ongoing parent-child relationship has evolved in light of a sparse legislative history . . . . [T]he language of [this ground for termination]

contemplate[s] a situation in which, regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitively lost that relationship, so that despite its former existence it has now been completely displaced. . . .

"Because [t]he statute's definition of an ongoing parent-child relationship . . . is inherently ambiguous when applied to noncustodial parents who must maintain their relationships with their children through visitation . . . [t]he evidence regarding the nature of the respondent's relationship with [the] child at the time of the termination hearing must be reviewed in the light of the circumstances under which visitation has been permitted. . . .

"In determining whether such a relationship exists, generally, the ultimate question is whether the child has no present [positive] memories or feelings for the natural parent." (Citations omitted; footnote omitted; internal quotation marks omitted.) *In re Carla C.*, supra, 167 Conn. App. 265–66.

We iterate that, with respect to the first part of its adjudicatory analysis, that is, whether an ongoing parent-child relationship exists, a trial court's inquiry must focus foremost on whether a child presently has positive feelings toward his or her parent. See *In re Jessica M.*, supra, 217 Conn. 469 ("the statute requires that a child have some 'present memories or feelings for the natural parent' that are positive in nature . . . the standard contemplates a relationship that has positive attributes" [citation omitted]); *In re Juvenile Appeal (Anonymous)*, supra, 177 Conn. 670 ("the *ultimate question* is whether the child has no present memories or feelings for the natural parent" [emphasis added]). Our courts have recognized only two narrow exceptions to the rule. First, "where the child involved is virtually a newborn infant whose present feelings can hardly be discerned with any reasonable degree of confidence . . . the inquiry must focus, not on the feelings of the infant, but on the positive feelings of the natural parent." *In re Valerie D.*, 223 Conn. 492, 532, 613 A.2d 748 (1992). Second, "when a custodial parent has interfered with an incarcerated parent's visitation and other efforts to maintain an ongoing parent-child relationship . . . the custodial parent cannot terminate the noncustodial parent's parental rights on the ground of no ongoing parent-child relationship." *In re Carla C.*, supra, 167 Conn. App. 251.

The court made the following factual findings as to the children's feelings: "[J] initially said that he misses his father and that he also sometimes feels angry about the loss of [his] mother and father. More recently [J] is reported to have told the school that his dad is a bad parent. [N] says that he hates his dad. [C] was very young at the time of [the] respondent father's incarcera-

tion and has little to no memory of him." In its application of the law to the facts, however, the court did not refer to these findings. Rather, the memorandum of decision clearly indicates that the court focused its adjudicatory analysis not on the nature and extent of the children's present feelings for the respondent but rather on the actions that the respondent undertook to maintain a relationship with the children. The court's stated justification for this inverse analysis was the interference exception we delineated in *In re Carla C.*, supra, 167 Conn. App. 251.[12]

In *In re Carla C.*, we traced a line of precedent that led us inexorably to the conclusion that a custodian, such as the grandparents here, cannot unreasonably deprive a noncustodial parent of an ongoing parent-child relationship so as to terminate the noncustodial parent's parental rights on that ground: "From these cases, we glean two relevant variables on which the inquiry into whether an ongoing parent-child relationship exists may turn: (1) a child's very young age, in light of which the parent's positive feelings toward the child are significant; and (2) another party's interference with the development of the relationship, in light of which the parent's efforts to maintain a relationship, even if unsuccessful, may demonstrate positive feelings toward the child. We recognize that the child's positive feelings for the noncustodial parent generally are determinative; *In re Jessica M.*, supra, 217 Conn. 467–68, 470; except where the child is too young to have any discernible feelings, in which case the positive feelings of the parent for the child play a role in the determination. *In re Valerie D.*, supra, 223 Conn. 532; *In re Alexander C.*, [67 Conn. App. 417, 425, 787 A.2d 608 (2001), aff'd, 262 Conn. 308, 813 A.2d 87 (2003)]. Even where the parent professes such [positive feelings for the child], however, the parent's perpetuation of the lack of a relationship by failing to use available resources to seek visitation or otherwise maintain contact with the child may establish the lack of an ongoing parent-child relationship. *In re Alexander C.*, supra, 426–27. Finally, evidence of the existence of a parent-child relationship is to be viewed in the light of circumstances that limited visitation; id., 425; including the conduct of the child's custodian at the time of the petition. *In re Jessica M.*, supra, 473; see also *In re Valerie D.*, supra, 533." (Footnote omitted.) *In re Carla C.*, supra, 167 Conn. App. 272–73.

In reaching our conclusion, we phrased the interference exception several different ways.[13] The underlying principles are nonetheless consistent, and we reassert them now all together: Where a custodial parent unreasonably has interfered with a noncustodial parent's visitation or other efforts to maintain or establish an ongoing parent-child relationship such that the custodial parent's unreasonable interference leads inevitably to the lack of an ongoing parent-child relationship, the

noncustodial parent's parental rights cannot be terminated on the ground of no ongoing parent-child relationship.

The court, however, did not apply that test correctly. A court logically cannot, as here, conclude *both* that an ongoing parent-child relationship exists *and* that unreasonable interference inevitably prevented the respondent from maintaining an ongoing parent-child relationship. Indeed, the notion that interference leads inevitably to the lack of a relationship means that before a court can consider the applicability of the interference exception at all, it must first determine that no ongoing parent-child relationship exists. This stands to reason, because if the child has positive feelings for the respondent parent, the inquiry is exhausted. Under our caselaw, a child's present positive feelings are enough to establish the existence of an ongoing parent-child relationship. It is only if the child possesses no present positive feelings for the parent—or if an infant child's present feelings are inscrutable—that a court may turn to other questions, such as interference.

Only this approach adheres to the policy considerations fundamental to § 45a-717 (g) (2) (C). That is, this approach both ensures that the court's analysis of the parent-child relationship minimizes issues of fault and protects against the possibility that questions of custody and parental rights are conflated. These concerns are prevalent throughout the sparse history of § 45a-717 (g) (2) (C). "This 'no-fault' statutory ground for termination was added . . . in 1974 . . . . Prior versions of [the statute] had provided for termination of parental rights, absent consent of the parents, only upon such so-called 'fault' grounds as abandonment, neglect, unfitness, or continuing physical or mental disability. . . .

"It is reasonable to read the language of 'no ongoing parent-child relationship' to contemplate a situation in which, regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitively lost that relationship, so that despite its former existence it has now been completely displaced. In either case the ultimate question is whether the child has no present memories or feelings for the natural parent." (Footnote omitted.) *In re Juvenile Appeal (Anonymous)*, supra, 177 Conn. 669–70; see also *In re Carla C.*, supra, 167 Conn. App. 265 n.18. Considering the feelings of the children first either avoids or postpones any question of the parent's actions. To do otherwise—to consider the positive feelings of the parent toward the child first—is to render the no-fault ground vestigial, and instead to conduct something akin to an abandonment analysis.[14]

This is true because our test of a noncustodial parent's positive feelings for his or her child is not blind to fault. "Even where the parent professes [positive]

feelings . . . the parent's perpetuation of the lack of a relationship by failing to use available resources to seek visitation or otherwise maintain contact with the child may establish the lack of an ongoing parent-child relationship." *In re Carla C.*, supra, 167 Conn. App. 272–73; see also *In re Alexander C.*, supra, 67 Conn. App. 425. Even if, as in this case, a parent is imprisoned, our courts repeatedly have held that he or she must at least attempt to take advantage of the resources at his or her disposal. See *In re Carla C.*, supra, 272–73; *In re Alexander C.*, supra, 425. See also *In re Juvenile Appeal (Docket No. 10155)*, 187 Conn. 431, 443, 446 A.2d 808 (1982) ("the inevitable restraints imposed by incarceration do not in themselves excuse a failure to make use of available though limited resources for contact with a distant child").

On the other hand, our courts have been wary of conflating questions of custody with questions of parental rights. "Although the severance of the parent-child relationship may be required under some circumstances, the United States Supreme Court has repeatedly held that the interest of parents in their children is a fundamental constitutional right that undeniably warrants deference and, absent a powerful countervailing interest, protection. *Stanley* v. *Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972); see also *In re Juvenile Appeal (83-CD)*, 189 Conn. 276, 295, 455 A.2d 1313 (1983) (noting that it is both a fundamental right and the policy of this state to maintain the integrity of the family). Termination of parental rights *does not follow automatically from parental conduct justifying the removal of custody.* The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. *Santosky* v. *Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982).

"Accordingly, [our legislature has] carefully limited situations in which countervailing interests are sufficiently powerful to justify the irretrievable destruction of family ties that the nonconsensual termination of parental rights accomplishes. . . .

"As a matter of statutory fiat, consideration of the best interests of the child cannot vitiate the necessity of compliance with the specified statutory standards for termination. . . . [I]nsistence upon strict compliance with the statutory criteria before termination of parental rights and subsequent adoption proceedings can occur is not [however] inconsistent with concern for the best interests of the child. . . . A child, no less than a parent, has a powerful interest in the preservation of the parent-child relationship. . . .

"Similarly, questions concerning the ultimate custodial placement of the child may not be intermingled with the issues of termination. . . . [A] parent cannot be displaced because someone else could do a better job of raising the child . . . ." (Citations omitted; emphasis added; footnote omitted; internal quotation marks omitted.) *In re Jessica M.*, supra, 217 Conn. 464–67.

All of these concerns are balanced when the carefully crafted, narrow exception is properly applied. On the one hand, the interference exception is only a narrow limitation on the no-fault ground for termination. On the other hand, the exception guards against the unconstitutional situation in which a custodian *creates* the lack of an ongoing parent-child relationship through "unreasonable" conduct that "inevitably" renders the parent's efforts to maintain or establish such relationship ineffective—including, in some cases, custody itself. It is therefore manifestly important that a court invoking interference properly apply the legal test.

In summation, interference exists only if a custodian's unreasonable interference with a noncustodial parent's efforts to maintain an ongoing parent-child relationship leads inevitably to the lack of such relationship. Therefore, a court legally and logically cannot find both that an ongoing parent-child relationship exists and that a custodial parent prevented one from existing. The trial court in this case did exactly that. Accordingly, the court's adjudicatory analysis was erroneous. The initial test for determining whether an ongoing parent-child relationship exists is whether the child has any present positive feelings for the parent. A trial court may consider the question of interference only if the child does not have such feelings. To do otherwise effectively vitiates § 45a-717 (g) (2) (C).

II

Even if the trial court's approach were legally and logically correct, its decision could not stand because its findings were fatally inconsistent. Specifically, the trial court found both that the grandparents' unreasonable conduct constituted interference and that there was no evidence of unreasonable interference by any person. The court first found in the adjudicatory phase that the grandparents had interfered with the parent-child relationships by (1) failing to facilitate contact between the respondent and the children as required and (2) influencing/manipulating the feelings of the children with false and misleading information about the respondent. In a subsequent finding[15] related to the dispositional phase, however, the court found by clear and convincing evidence[16] that "[t]here was no evidence presented demonstrating that [the respondent] father was prevented from maintaining a meaningful relationship by the unreasonable acts of another person or by

the economic circumstance of the parent."

Where a court's opinion contains fundamental logical inconsistencies, it may warrant reversal. See *In re Pedro J. C.*, 154 Conn. App. 517, 539, 105 A.3d 943 (2014); see also *In re Joseph W.*, 301 Conn. 245, 264–65, 21 A.3d 723 (2011) (trial court erred in denying motion to open judgment adjudicating neglect and subsequently permitting respondent to contest that adjudication); *Kaplan & Jellinghaus, P.C.* v. *Newfield Yacht Sales, Inc.*, 179 Conn. 290, 292, 426 A.2d 278 (1979) ("[a] trial court's conclusions are not erroneous unless they violate law, logic, or reason or are inconsistent with the subordinate facts in the finding").

In the wake of *Santosky* v. *Kramer*, supra, 455 U.S. 745, and *In re Juvenile Appeal (Anonymous)*, supra, 177 Conn. 648, our legislature enacted what is now § 45a-717 (i), which requires a trial court to make specific written findings when considering a contested petition to terminate parental rights.[17] These written findings are required in contested cases where a ground for termination has been proven regardless of whether the trial court actually terminates a respondent's parental rights. Although our caselaw is clear that the best interests of the children come into play only if a ground for termination of parental rights has been proven; see footnote 14 of this opinion; the court here proceeded to the dispositional phase.

Among the required written findings is a consideration of "the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent." General Statutes § 45a-717 (i) (6). This statutory factor clearly implicates the same underlying facts as the interference exception. First, both concern unreasonable conduct on the part of another parent or other person, which here would include the custodial grandparents.[18] Second, both concern interference with a respondent parent's efforts to maintain a parent-child relationship.[19] Third, both make it clear that such interference must *cause* the lack of the parent-child relationship. Accordingly, we cannot reconcile the trial court's findings by clear and convincing evidence both that there was interference and that there was no evidence of interference.

In conclusion, the trial court applied the incorrect legal test for determining whether an ongoing parent-child relationship exists. A court must first determine that a child has no present positive feelings for his or her parent before it considers whether a custodian unreasonably interfered with the parent's efforts to maintain or establish such a relationship. Further, even under the incorrect legal test, the trial court's findings were fundamentally inconsistent because the court

found both that there was interference and that there was no evidence of interference.

The judgments are reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** November 16, 2017, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The maternal grandmother is the petitioner pro forma. Both maternal grandparents are currently custodians, and the maternal grandfather signed the applications for termination of parental rights as a proposed statutory parent. See General Statutes § 45a-707 (7) ("'Statutory parent' means the Commissioner of Children and Families or the child-placing agency appointed by the court for the purpose of the adoption of a minor child or minor children") and § 45a-717 (g) (permitting court to appoint statutory parent upon termination of parental rights).

[2] Initially, the petitioner also sought to terminate the parental rights of the mother. The mother later consented to such termination and, as a result, is neither a respondent to the petition nor a participant in this appeal.

[3] Section 45a-717 (g) provides, in relevant part: "At the adjourned hearing or at the initial hearing where no investigation and report has been requested, the court may approve a petition terminating the parental rights and may appoint a guardian of the person of the child, or, if the petitioner requests, the court may appoint a statutory parent, if it finds, upon clear and convincing evidence, that (1) the termination is in the best interest of the child, and (2) . . . (C) there is no ongoing parent-child relationship which is defined as the relationship that ordinarily develops as a result of a parent having met on a continuing, day-to-day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of the parent-child relationship would be detrimental to the best interests of the child . . . ."

[4] The children's attorney, pursuant to Practice Book § 67-13, adopted the petitioner's brief on appeal and was present at oral argument.

[5] In accordance with our policy of protecting the privacy interests of victims of sexual abuse, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

[6] The mother, however, was not subject to any protective order.

[7] See § 45a-717 (g) (2) (B).

[8] Section 45a-717 (e) provides, in relevant part: "(1) The court may, and in any contested case shall, request the Commissioner of Children and Families or any child-placing agency licensed by the commissioner to make an investigation and written report to it, within ninety days from the receipt of such request. The report shall indicate the physical, mental and emotional status of the child and shall contain such facts as may be relevant to the court's determination of whether the proposed termination of parental rights will be in the best interests of the child, including the physical, mental, social and financial condition of the biological parents, and any other factors which the commissioner or such child-placing agency finds relevant to the court's determination of whether the proposed termination will be in the best interests of the child."

[9] Compare General Statutes § 17a-111a et seq., according to which the *state* petitions to terminate parental rights. Although there are significant distinctions between the two schemes, "[t]his court previously has applied the same analytical framework and meaning of abandonment and lack of ongoing parent-child relationship to petitions to terminate parental rights pursuant to either [General Statutes] § 17a-112 (j) (3) (A) and (D) or § 45a-717 (g) (2) (A) and (C)." *In re Brian T.*, 134 Conn. App. 1, 11 n.3, 38 A.3d 114 (2012).

[10] We note that in 2015, our Supreme Court announced a new standard of review for certain cases involving a petition to terminate parental rights filed by the Commissioner of the department pursuant to General Statutes § 17a-11a et seq. In *In re Shane M.*, 318 Conn. 569, 587–88, 122 A.3d 1247 (2015), the court stated the following. "Finally, we take this opportunity to clarify our standard of review of a trial court's finding that a parent has

failed to achieve sufficient rehabilitation. We have historically reviewed for clear error *both* the trial court's subordinate factual findings and its determination that a parent has failed to rehabilitate. . . . While we remain convinced that clear error review is appropriate for the trial court's subordinate factual findings, we now recognize that the trial court's ultimate conclusion of whether a parent has failed to rehabilitate involves a different exercise by the trial court. A conclusion of failure to rehabilitate is drawn from *both* the trial court's factual findings and from its weighing of the facts in assessing whether those findings satisfy the failure to rehabilitate ground set forth in § 17a-112 (j) (3) (B). Accordingly, we now believe that the appropriate standard of review is one of evidentiary sufficiency, that is, whether the trial court could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify its [ultimate conclusion] . . . . When applying this standard, we construe the evidence in a manner most favorable to sustaining the judgment of the trial court." (Citation omitted; emphasis in original; footnotes omitted; internal quotation marks omitted.) Id., 587–88.

Since then, our appellate courts have embraced the new standard in other contexts. See *In re Oreoluwa O.*, 321 Conn. 523, 533, 139 A.3d 674 (2016) ("it is appropriate to apply the same standard of review . . . to whether the department made reasonable efforts at reunification" pursuant to § 17a-112 [j] [1]); *In re Gabriella A.*, 319 Conn. 775, 789–90, 127 A.3d 948 (2015) ("[w]e apply the identical standard of review to a trial court's determination that a parent is unable to benefit from reunification services" pursuant to § 17a-112 [j] [1]); accord *In re Jayce O.*, 323 Conn. 690, 150 A.3d 640 (2016) (failure to rehabilitate pursuant to § 17a-112 [j] [3] [E]); *In re Savannah Y.*, 172 Conn. App. 266, 158 A.3d 864 (failure to rehabilitate pursuant to § 17a-112 [j] [3] [B] [i]), cert. denied, 325 Conn. 925, 160 A.3d 1067 (2017); *In re Lilyana P.*, 169 Conn. App. 708, 152 A.3d 99 (2016) (failure to rehabilitate pursuant to § 17a-112 [j] [3] [B] [i]), cert. denied, 324 Conn. 916, 153 A.3d 1290 (2017); *In re Leilah W.*, 166 Conn. App. 48, 141 A.3d 1000 (2016) (failure to rehabilitate pursuant to § 17a-112 [j] [3] [B] [i]); *In re Quamaine K.*, 164 Conn. App. 775, 137 A.3d 951 (whether department made reasonable efforts toward reunification pursuant to § 17a-112 [j] [3] [B]), cert. denied, 321 Conn. 919, 136 A.3d 1276 (2016); *In re Victor D.*, 161 Conn. App. 604, 128 A.3d 608 (2015) (whether department made reasonable efforts toward reunification pursuant to § 17a-112 [j] [1] and failure to rehabilitate pursuant to § 17a-112 [j] [3] [B]); *In re James O.*, 160 Conn. App. 506, 127 A.3d 375 (2015) (whether department made reasonable efforts toward reunification pursuant to § 17a-112 [j] [1]), aff'd, 322 Conn. 636, 142 A.3d 1147 (2016).

Conversely, we have twice declined to extend the standard of review to the court's consideration of the best interests of a child where the evidence supported our decision under either standard. See *In re Elijah G.-R.*, 167 Conn. App. 1, 29–30 n.11, 142 A.3d 482 (2016); *In re Nioshka A. N.*, 161 Conn. App. 627, 637 n.9, 128 A.3d 619, cert. denied, 320 Conn. 912, 128 A.3d 955 (2015).

We need not decide whether the *In Re Shane M.* standard applies to petitions brought pursuant to § 45a-715 et seq. because our holding rests not on the trial court's factual findings but on the legal and logical inconsistencies in its judgment, which are subject to plenary review under either standard. See *In re James O.*, 322 Conn. 636, 649, 142 A.3d 1147 (2016) ("[t]he interpretation of a trial court's judgment presents a question of law over which our review is plenary" [internal quotation marks omitted]).

[11] The petitioner further argues that because there was error at every stage of the proceeding, we should reverse the judgments of the trial court and remand with direction that the court grant the petitions. For the reasons stated herein, we decline to do so.

[12] The parties concede that the youngest of the children, C, falls within the virtual infancy exception. We do not accept that concession. See *State* v. *Harris*, 60 Conn. App. 436, 443, 759 A.2d 1040, cert. denied, 255 Conn. 907, 762 A.2d 911 (2000) ("this court is not bound to accept concessions made by a party on appeal"). The trial court did not explicitly determine whether one or all of the children were infants, and the trial court conducted the same analysis for all three children. Though the children's ages patently factored into the court's consideration, the court's analysis was premised on interference. We therefore will not make a determination on this question for the first time on appeal.

[13] We stated and restated the rule thusly: "We . . . agree with the respondent that when a custodial parent has interfered with an incarcerated par-

ent's visitation and other efforts to maintain an ongoing parent-child relationship with the parties' child, the custodial parent cannot terminate the noncustodial parent's parental rights on the ground of no ongoing parent-child relationship." *In re Carla C.*, supra, 167 Conn. App. 251. "We agree with the respondent that a parent whose conduct inevitably has led to the lack of an ongoing parent-child relationship may not terminate parental rights on this ground." Id., 262. "[W]e conclude that the petitioner may not establish the lack of an ongoing parent-child relationship on the basis of her own interference with the respondent's efforts to maintain contact with [the child] . . . ." Id., 280–81.

[14] "A parent abandons a child if the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child . . . . *Abandonment focuses on the parent's conduct. . . .*" (Citation omitted; emphasis added; internal quotation marks omitted.) *In re Ilyssa G.*, 105 Conn. App. 41, 46–47, 936 A.2d 674 (2007), cert. denied, 285 Conn. 918, 943 A.2d 475 (2008).

[15] The finding at issue necessarily is the equivalent of an obiter dictum because "[t]he best interest standard . . . does not become relevant until after it has been determined that no parent-child relationship exists." (Internal quotation marks omitted.) *In re Carla C.*, supra, 167 Conn. App. 265. With respect to the dispositional phase, "[o]ur statutes and [case law] make it crystal clear that the determination of the child's best interests comes into play only *after* statutory grounds for termination of parental rights have been established by clear and convincing evidence." (Emphasis in original.) *In re Valerie D.*, supra, 223 Conn. 511. "General Statutes [§ 45a-717 (f)] expressly requires the court to find, in addition to the existence of an enumerated statutory ground for termination, that such termination is in the best interests of the child. This statutory element was added to § [45a-717 (f)] by Public Acts 1983, No. 83-478, § 2. Both its plain language and its available legislative history indicate that the legislature intended this provision to serve as an additional, not an alternative, requirement for the termination of parental rights." *In re Jessica M.*, supra, 217 Conn. 466 n.5.

Nevertheless, it is axiomatic that "[w]e review [the] case on the theory upon which it was tried and upon which the trial court decided it." *Fuessenich* v. *DiNardo*, 195 Conn. 144, 151, 487 A.2d 514 (1985); see also *Machiz* v. *Homer Harmon, Inc.*, 146 Conn. 523, 525, 152 A.2d 629 (1959); *Cole* v. *Steinlauf*, 144 Conn. 629, 631–32, 136 A.2d 744 (1957). In a hearing on a petition to terminate parental rights, the trial court may, at its discretion, elect not to bifurcate the proceedings and to hear evidence on the best interests of the children so long as it finds that the petitioner proves the existence of a ground for termination by clear and convincing evidence first. See *State* v. *Anonymous*, 179 Conn. 155, 172–74, 425 A.2d 939 (1979); *In re Deana E.*, 61 Conn. App. 197, 205, 763 A.2d 45 (2000) ("[t]he decision whether to bifurcate a termination of parental rights proceeding lies solely within the discretion of the trial court"), cert. denied, 255 Conn. 941, 768 A.2d 949 (2001). Here, the trial court heard evidence on the best interests of the children and made findings thereon. On appeal, the parties argued the merits of those findings.

[16] Nowhere does § 45a-717 (i) require that the court's specific, written findings be made by clear and convincing evidence, though the court is entitled to do so. See *In re Davonta V.*, 98 Conn. App. 42, 46–47, 907 A.2d 126 (2006) (no requirement that each factor of analogous statute, § 17a-112 [k], be proven by clear and convincing evidence), aff'd, 285 Conn. 483, 940 A.2d 733 (2008); *In re Victoria B.*, 79 Conn. App. 245, 258–59, 829 A.2d 855 (2003) (factors in analogous statute, § 17a-112 [k], are merely guidelines and are not prerequisites that must be proved at all, let alone by clear and convincing evidence). Ultimate findings, those on (1) the existence of a ground for termination and (2) the best interests of the children, must nevertheless be predicated on clear and convincing evidence.

[17] General Statutes § 45a-717 (i) provides: "Except in the case where termination is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature, and extent of services offered, provided and made available to the parent and the child by a child-placing agency to facilitate the reunion of the child with the parent; (2) the terms of any applicable court order entered into and agreed upon by any individual or child-placing agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (3) the feelings and emotional ties of the child with respect to the child's parents, any guardian of the child's person and any person who has exercised physical care, custody

or control of the child for at least one year and with whom the child has developed significant emotional ties; (4) the age of the child; (5) the efforts the parent has made to adjust such parent's circumstances, conduct or conditions to make it in the best interest of the child to return the child to the parent's home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (6) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent." Section 45a-717 (i) was formerly codified as § 45a-717 (h) until the legislature passed Public Act 16-70, effective July 1, 2016.

[18] Our limited caselaw on this subject supports a reasonableness standard. In *In re Valerie D.*, supra, 223 Conn. 532 n.35, 532–34, our Supreme Court ruled that "the state may not . . . obtain and maintain custody of the child so as to create a lack of an ongoing parent-child relationship" because it would have required "extraordinary and heroic efforts" for the respondent mother to defeat the state's petition to terminate her parental rights. In *In re Carla C.*, supra, 167 Conn. App. 273–74, we then applied this rule to private petitioners and held that a custodial mother could not prevail in her termination of parental rights petition for lack of an ongoing parent-child relationship where she violated a court-ordered custody agreement to which she stipulated, destroyed the respondent father's letters and cards to the child and told the child nothing about who or where her father was. In that case, we agreed with the respondent's argument that the lack of an ongoing parent-child relationship "may not be established where a custodial parent *unreasonably* has interfered with the development of the other parent's relationship with the parties' child . . . ." (Emphasis added.) Id., 262. We also found instructive *In re Caleb P.*, 53 Conn. Supp. 329, 113 A.3d 507 (2014), in which the Superior Court, *Hon. Francis J. Foley*, judge trial referee, found that petitioner mother had interfered with the respondent's efforts to maintain an ongoing parent-child relationship where she failed to appear at several court-ordered counseling and visitation appointments and did not respond to various communications. Id., 344–46.

[19] Our caselaw discusses the distinction between "no relationship" and "no meaningful relationship." See *In re Jessica M.*, supra, 217 Conn. 467–72. That notwithstanding, it follows logically that a parent who is not prevented from having a meaningful relationship is not prevented from having a relationship.